Case No. 24-30413

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

**Three Fifty Markets, Limited,**

*Plaintiff – Appellee*

**v.**

**Argos M M/V, her engines, tackle, equipment, appurtenances, etc., in rem;
Argos Bulkers, Incorporated, as owner and claimant of the M/V Argos M,**

*Defendants – Appellants*

_____

**PMG Holding SRL**

*Plaintiff*

**v.**

**Argos M M/V, her engines, tackle, equipment, appurtenances, etc., in rem,**

*Defendant – Appellant*

_____

# APPEAL FROM THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA
_____

## PETITION FOR REHEARING *EN BANC* OF
## DEFENDANTS-APPELLANTS, M/V ARGOS M, *IN REM*, AND
## ARGOS BULKERS, INCORPORATED, AS OWNER AND CLAIMANT OF
## THE M/V ARGOS M

**MURPHY, ROGERS, SLOSS,**
   **GAMBEL & TOMPKINS**

Peter B. Sloss       (#17142)
psloss@mrsnola.com
John H. Musser, V (#22545)
jmusser@mrsnola.com
Tarryn E. Walsh    (#36072)
twalsh@mrsnola.com
701 Poydras St., Suite 400
New Orleans, LA 70139
Telephone:  504.523.0400
Facsimile:    504.523.5574
***Attorneys for Argos Bulkers, Inc., solely as
owner and claimant of the M/V ARGOS M,
with a full reservation of all rights and
defenses pursuant to Supplemental Rule E(8)
of the Federal Rules of Civil Procedure***

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Cir. R. 28.2.1 have an interest in the outcome of the case. These representations are made so that the Judges of this Court may evaluate possible disqualification or recusal:

1. Three Fifty Markets, Limited
   *Plaintiff – Appellee*

2. Argos M M/V, her engines, tackle, equipment, appurtenances, etc., in rem
   *Defendant – Appellant*

3. Argos Bulkers, Incorporated, owner and claimant of the M/V Argos M
   *Defendant – Appellant*

4. William R. Bennett III, Noe S. Hamra, and Blank Rome LLP
   *Counsel for Plaintiff-Appellee, Three Fifty Markets, Limited*

5. R. Chauvin Kean, Bradley J. Schlotterer, and Kean Miller LLP
   *Counsel for Plaintiff-Appellee, Three Fifty Markets, Limited*

6. Peter B. Sloss, John H. Musser, V, and Tarryn E. Walsh, and Murphy, Rogers, Sloss, Gambel and Tompkins, APLC

   *Counsel for Defendants-Appellants, Argos M M/V, her engines, tackle, equipment, appurtenances, etc., in rem, and Argos Bulkers, Incorporated, as owner and claimant of the M/V Argos M.*

   _/s/ Tarryn E. Walsh_
   Tarryn E. Walsh (#36072)

   *Attorney for Argos Bulkers, Inc., solely as owner and claimant of the M/V ARGOS M, with a full reservation of all rights and defenses pursuant to Supplemental Rule E(8) of the Federal Rules of Civil Procedure*

## STATEMENT OF COUNSEL

Consistent with Federal Rule of Appellate Procedure 40(b)(2) and Fifth Circuit Rule 40.2.2.2, undersigned counsel for Defendants-Appellants, "Argos" collectively, submit this statement affirming their belief that the narrowly-tailored choice-of-law question presented herein and raised by the Honorable Judge Andrew S. Oldham's 2 February 2026 dissent constitutes one of exceptional importance in the realm of maritime law and bears important significance to the maritime community around the world as well as U.S. maritime trade.

/s/ Tarryn E. Walsh
Peter B. Sloss (#17142)
John H. Musser, V (#22545)
Tarryn E. Walsh (#36072)
MURPHY, ROGERS, SLOSS,
GAMBEL & TOMPKINS APLC

## TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS** ........................................ iii

**STATEMENT OF COUNSEL** .............................................................. iv

**TABLE OF CONTENTS** ...................................................................... v

**TABLE OF AUTHORITIES** ................................................................ vi

**INTRODUCTION** ................................................................................. 1

**STATEMENT OF THE ISSUE FOR *EN BANC* CONSIDERATION** ......... 2

**STATEMENT OF COURSE OF PROCEEDINGS AND DISPOSITION** .... 2

**STATEMENT OF NECESSARY FACTS** ............................................... 4

**ARGUMENT AND AUTHORITIES** ...................................................... 9

   *I.   The Fifth Circuit has not considered the contractual effect of "no-lien" clauses on a charterer's authority to bind the Vessel to otherwise prohibited terms.* .......................................................................... 9

   *II.  Echoing Judge Oldham's dissent, disregarding the antecedent charterparty contract in a choice-of-law analysis violates contract law.* ........................ 12

   *III. As a corollary inquiry with a choice-of-law clause that seeks to bind a non-party vessel, any required agency analysis must be performed under foreign law, as it necessarily must precede the application of U.S. law.* ................... 16

**CONCLUSION** .................................................................................... 18

**CERTIFICATE OF SERVICE** .............................................................. 21

**CERTIFICATE OF COMPLIANCE** ...................................................... 22

# TABLE OF AUTHORITIES

## CASES

*DeNicola v. Cunard Line, Ltd.,*
  642 F.2d 5 (1st Cir. 1981) ................................................................ 17

*Glander Int'l Bunkering Inc. v. M/V Dvina Gulf*,
  No. CV195206, 2022 WL 950995 (D.N.J. Mar. 29, 2022)................................ 17

*Gulf Trading & Transp. Co. v. Vessel Hoegh Shield*,
  658 F.2d 363 (5th Cir. 1981) ...........................................................10

*Liverpool & London S.S. Prot. & Indem. Ass'n Ltd. v. QUEEN OF LEMAN MV*,
  296 F.3d 350 (5th Cir. 2002) .......................................................10, 17

*OceanConnect.com, Inc. v. M/V FESCO ANGARA*,
  No. 2:09-1694, 2012 WL 3835098 (W.D. La. Aug. 31, 2012) ............................ 17

*Topoil AB v. M/V ORUC REIS*,
  No. CV H-15-460, 2016 WL 11474777 (S.D. Tex. Aug. 25, 2016)...................... 17

*Tramp Oil & Marine, Ltd. v. M/V Mermaid I*,
  805 F.2d 42 (1st Cir. 1986) ............................................................ 16

*Trans-Tec Asia v. M/V HARMONY CONTAINER*,
  518 F.3d 1120 (9th Cir. 2008).......................................................10, 17

*World Fuel Servs. Singapore Pte, Ltd. v. Bulk Juliana M/V*,
  822 F.3d 766 (5th Cir. 2016)....................................................passim

*World Fuel Servs. Trading, DMCC v. M/V HEBEI SHIJIAZHUANG*,
  12 F.Supp.3d 792 (E.D. Va. 2014) .................................................... 17

## RULES

Fed. R. App. P. 40..................................................................iv

Fifth Cir. R. 40...................................................................iv

## TREATISES

Thomas J. Schoenbaum, 1 ADMIRALTY & MAR. LAW § 9:3 (7th ed. 2025)...............1

## <u>INTRODUCTION</u>

While the maritime lien remedy has existed for centuries and been formalized statutorily in the United States since 1910,[1] in recent years, foreign entities providing necessaries around the world have sought to create by contract maritime liens under U.S. law by including U.S. choice-of-law clauses in their general terms and conditions ("GTCS"), regardless of the legal regime that would otherwise apply to the transaction and/or control the contract at issue.

However, these GTCS are often tied to a contract for necessaries to which the vessel owner that would be prejudiced by a maritime lien is not a party. Often, vessel owners who charter ships have contractually protected themselves against liens incurred by charterers by including "no lien" clauses in their charterparties that preclude a charterer from taking actions that would jeopardize the vessel; yet, maritime courts have not yet evaluated the interplay of the antecedent charterparty with later-in-time contracts for supplies whose terms are at odds with the authority limits in the antecedent contract.

As such, Argos respectfully requests that this Honorable Panel grant its Petition and consider *en banc* this critically important maritime legal question.

---

[1] Schoenbaum, 1 ADMIRALTY & MAR. LAW § 9:3 (7th ed. 2025).

## STATEMENT OF THE ISSUE FOR *EN BANC* CONSIDERATION

Where a charterparty undisputedly divests a charterer of authority to bind the Vessel to any lien-related encumbrances and that charterparty is governed by foreign law, must a court disregard that prohibition in favor of enforcing a choice-of-law provision in a later-in-time contract for necessaries entered into by a downstream entity without actual authority to bind the vessel, or is a court to undertake a choice-of-law evaluation to establish the effect of the antecedent charterparty provisions on the enforceability of the terms from the later contract?

## STATEMENT OF COURSE OF PROCEEDINGS AND DISPOSITION

On 16 February 2023, Three Fifty Markets Ltd. ("TFM") filed its Verified Complaint against the ARGOS M, *in rem*, seeking a maritime lien resulting in the arrest of the Vessel on that date.[2]

On 21 March 2023, Argos appeared solely as claimant of the Vessel and filed its Answer to TFM's Verified Complaint.[3] Litigation ensued, and on 1 November 2023 and 7 February 2024, the district court denied the parties' respective dispositive motions, finding that genuine issues of fact existed.[4]

A bench trial proceeded on 26 February 2024. TFM called two witnesses,

---

[2] ROA.22-59.
[3] ROA.198-206.
[4] ROA.1231; ROA.2055-2059.

including its president, Aaron Loveman.[5] TFM also submitted the deposition transcripts of BunkerEx's Dean Tennant and Argos's corporate deposition.[6] At the conclusion of TFM's case, Argos moved for dismissal under Federal Rule of Civil Procedure 52(c), but was denied.[7] With Argos's deposition already entered, Argos did not call any witnesses, and the trial concluded, subject to post-trial briefing.[8]

Following trial, Argos timely filed its hearsay objections to certain portions of Tennant's testimony, which the district court overruled.[9] After the parties filed post-trial briefs,[10] the trial court ordered additional briefing on the choice-of-law issue.[11]

The district court issued its Findings of Fact and Conclusions of Law on 25 April 2024, finding a maritime lien existed in favor of TFM but reserving the issue of attorneys' fees for an additional hearing.[12] On 29 May 2024, the court denied the request for attorneys' fees.[13]

A Judgment was entered on 6 June 2024, awarding TFM a total of

---

[5] ROA.2988-3097.
[6] ROA.2993-3007.
[7] ROA.3094-3095.
[8] ROA.3095-3097.
[9] ROA.2606-2612; ROA.2614-2616.
[10] ROA.2617-2629; ROA.2634-2663.
[11] ROA.2664-2698.
[12] ROA.2764-2783.
[13] ROA.2959-2964.

$722,641.79.[14] Argos filed a timely Notice of Appeal on 1 July 2024.[15]

After briefing extensions tied to record supplementation, Argos's Appellant Brief was filed on 23 September 2024, TFM's Appellee Brief was filed on 29 December 2024, and Argos's Reply Brief was filed on 21 January 2025.[16] Oral argument occurred on 29 April 2025, before the Panel of the Honorable Judge James L. Dennis, the Honorable Judge Andrew S. Oldham, and the Honorable Dana M. Douglas.[17]

On 2 February 2026, the Court released its decision, a 2-1 majority opinion authored by Judge Douglas and a dissent from Judge Oldham.[18] In addition to this filing, Argos is concurrently filing a Petition for Panel Rehearing.

## STATEMENT OF NECESSARY FACTS

The ARGOS M ("the Vessel") is a Liberian-flagged cargo vessel owned by Argos.[19] On 28 July 2022, Argos time chartered the Vessel to Shimsupa GmbH ("Shimsupa"), with a recap incorporating main body terms from another form charter and riders.[20] Although AUM Scrap and Metals Waste Trading, LLC

---

[14] ROA.2965.
[15] ROA.2966.
[16] R. Docs. 36, 63, and 65.
[17] R. Docs. 79 and 83.
[18] R. Doc. 92.
[19] Nos. 2 and 3 at ROA.2039.
[20] No. 7 at ROA.2039; *see also* ROA.3201-3314.

("AUM") guaranteed Shimsupa's financial obligations under the charter, the relevant charter for the Vessel was *solely* between Argos and Shimsupa, and AUM was <u>not</u> a party to the charter, though it received a copy.[21]

Critically, the governing charter contains an explicit "no lien" clause at Main Body lines 112-113; Rider Clause 109 repeats it and adds additional limitations, including *disallowing specifically any lien for bunkers* and requiring that Charterers inform bunker sellers in writing regarding the "Non-Lien Notice," while Owners disclaim all responsibility for unpaid bills at Clause 52.[22] These unambiguous contractual provisions confirm Shimsupa lacked actual authority to bind the Vessel when it came to obtaining bunkers.

As time-charterer, Shimsupa bore responsibility for bunkering the Vessel under the charterparty.[23] Purportedly, Shimsupa did not handle bunker arrangements on its own. Instead, a separate and discrete company did so, *for a fee* – AUM, allegedly on Shimsupa's behalf.[24]

In early October 2022, Fahim Shamsi of AUM (with an "@aum-metals.com" email address) contacted bunker broker Dean Tennant of London-based BunkerEx,

---

[21] *Id.*
[22] <u>ROA.3224</u> (ll. 112-113); <u>ROA.3241</u>; <u>ROA.3270</u>.
[23] <u>ROA.2040</u>(No. 9).
[24] <u>ROA.3195</u>. *See* <u>ROA.3565-3566</u>(18:22–19:23, 21:24–22:6), <u>ROA.3757</u>(60:12-24).

Ltd. ("BunkerEx"), seeking bunkers for the Vessel at Las Palmas, Spain.[25] To accomplish that service, Tennant reached out to new-to-the-game bunker trader Aaron Loveman of TFM.[26]

Tennant ultimately obtained only one quote, which he relayed to AUM via WhatsApp on 11 October 2022 and Shamsi/AUM accepted.[27] After confirming the deal, BunkerEx reportedly emailed the "Official Confirmation," which listed as "Buyer" "AUM Scrap and Metals Waste Trading LLC and/or Owner and/or Master of Vessel ARGOS M," to Shamsi at his "@aum-metals.com" address.[28]

Significantly, the bunker deal was confected via phone and email between Tennant and AUM's Shamsi, with *no direct* communication occurring between TFM and anyone at AUM, Shimsupa, or Argos.[29] The *only* evidence of the "Official Confirmation" for the stem was an email with a timestamp of 19:19 London time (assuming it actually attached the Order Confirmation and TFM's GTCS, which was not proven).[30] While originally anticipated to begin at 19:00 (before Tennant's email confirmation was issued),[31] the ARGOS M bunkering had already commenced

---

[25] ROA.3098-3102.
[26] ROA.3011(ll.15-20); ROA.3567(26:2–28:24).
[27] ROA.3098-3102.
[28] ROA.3173; ROA.3187.
[29] ROA.3045(ll.3-17); ROA.3055(l.13-25); ROA.3057(ll.2-7); ROA.3060(l.25)-ROA.3061(l.1); ROA.3062(ll.1-6).
[30] ROA.3173.
[31] ROA.2586.

at 18:18 in Las Palmas (the same time zone as London (UTC+1)), and was completed at 22:54. Tennant's 19:19 email went to AUM, based in Dubai, three hours ahead of London in October 2022, which means that email was first received in Dubai inboxes at 22:19 LT, *well beyond* business hours, with no notice of the GTCS before bunkering commenced. Of import, TFM's GTCS were not publicly available, so only a recipient of the Order Confirmation would know that one needed to request the GTCS to review them.[32]

The bunkers were stemmed aboard the Vessel in Spain, and on 7 November 2022, TFM issued an invoice, via BunkerEx, to "AUM Scrap and Waste Metals Trading LLC" for 800 metric tons of fuel at $787.00 per metric ton, with a due date of 10 November 2022.[33] AUM never paid.

As discussed above, the matter was sued upon, went to trial, and was appealed. On 2 February 2026, the Panel's 2-1 decision was released, with the majority affirming the district court decision, although the Panel uniformly found error in the district court's refusal to conduct the predicate choice-of-law analysis.[34] The majority determined that the *Lauritzen* analysis yielded the application of either Greek or U.K. law to the AUM-TFM bunker contract, both of which it found

---

[32] ROA.2678.

[33] ROA.3190-3193.

[34] R. Doc. 92, pp. 6-8, 39.

allowed for incorporation by reference and were similar to U.S. law.[35] Despite the fact that TFM failed to present any evidence that the GTCS were received by any vessel-related party *prior to* contract performance so as to afford an opportunity to assent or object to same, the majority held that the U.S. choice-of-law clause was validly incorporated into the AUM-TFM bunker contract, such that U.S. law governed the suit. The majority went on to find the existence of apparent authority sufficient to bind the Vessel, despite the undisputed existence of the "no lien" provisions in the antecedent charter, ultimately affirming the district court's maritime lien finding.[36]

Judge Oldham penned an eleven-page dissent voicing his disagreement with the majority's disregard of the charterparty and the litany of choice-of-law questions posed by same. Focusing on the interplay between the Argos-Shimsupa charter and the AUM-TFM bunker contract, Judge Oldham identified no less than five legal questions implicated by the facts at hand, all of which required a predicate answer based upon the Argos-Shimsupa charterparty. He emphasized that, to determine whether Shimsupa (or an appropriate downstream entity) could enter into a contract that contemplated a lien for bunkers given the charterparty prohibitions, its authority

---

[35] R. Doc. 92, pp. 6-11.
[36] R. Doc. 92, pp. 11-29.

to do so (or lack thereof) had to be determined under the law governing the charter.[37]

Summing up the issue of importance:

> If Sovereign *X*'s law says, for example, that no-liens provisions in
> charterparties generally prohibit charterers from signing lien
> provisions, that might mean that the entire bunker contract is void. Or
> it might mean that certain provisions in the bunker contract are void.
> Or it might mean the contract stands as a matter of contract law, but it
> is ineffectual in binding the boat as a matter of agency law, maritime
> law, property law, or some other body of law Sovereign *X* might
> consider relevant.[38]

After observing that this Court's *BULK JULIANA* decision "is not to the
contrary," Judge Oldham concluded that the correct course of action would be to
remand the matter to determine the effect of the law governing the charterparty on
the enforceability of the choice-of-law clause in the AUM-TFM contract.[39] And that
brings us to the issue presented to this Honorable Court for *en banc* consideration.

## ARGUMENT AND AUTHORITIES

I. ***The Fifth Circuit has not considered the contractual effect of "no-lien"
clauses on a charterer's authority to bind the Vessel to otherwise prohibited
terms.***

This Honorable Court's modern seminal choice-of-law decision in the realm
of maritime liens is *World Fuel Servs. Singapore Pte, Ltd. v. Bulk Juliana M/V*, 822
F.3d 766, 773 (5th Cir. 2016). That decision compels courts within the Circuit to

---

[37] R. Doc. 92, pp. 34-35.
[38] R. Doc. 92, p. 36.
[39] R. Doc. 92, p. 37-40.

conduct a choice-of-law analysis when confronted with a bunker contract that incorporates a U.S. choice-of-law and/or U.S.-focused maritime lien clause, with the threshold inquiry examining which country's law governs formation of the bunker contract and whether that bunker contract considers such a clause to be valid.[40] *Id.* at 771. While the majority correctly conducted that predicate analysis here, Judge Oldham's dissent points out that the predicate analysis does not fully answer the question when the facts *undisputedly* involve no-lien clauses in the antecedent charter and thus implicate further contractual questions.[41] This critical corollary point does not appear to ever have been considered by this Honorable Court,[42] meriting *en banc* consideration.

To piggyback on a point raised in dissent, this Honorable Court reiterated in its *BULK JULIANA* decision that "recognition of freely negotiated contract terms encourages predictability and certainty in the realm of international maritime transactions." 822 F.3d at 773 (quoting *Trans-Tec Asia v. M/V HARMONY CONTAINER*, 518 F.3d 1120, 1131 (9th Cir. 2008)). Extrapolating that point to the

---

[40] *See* R. Doc. 92, p. 6.

[41] R. Doc. 92, pp. 30-40.

[42] The major choice-of-law decisions from this Court in the maritime lien context seem to be *BULK JULIANA*, *supra*, the *QUEEN OF LEMAN*, *infra*, and *Gulf Trading & Transp. Co. v. Vessel Hoegh Shield*, 658 F.2d 363, 366-68 (5th Cir. 1981). None of those decisions considered the inquiry presented here.

facts here, the "freely negotiated contract terms" in the Argos-Shimsupa charter are not "recogniz[ed]" if they are wholly disregarded in favor of a later-in-time bunker contract to which *neither* Argos *nor* Shimsupa was a direct party.

It is difficult to discern a legal contractual basis for allowing an entity to enter into subsequent contracts that violate its contractual obligations in a related, antecedent prior contract. By way of the first contract, Shimsupa lacked the authority to enter into any contract that subjected the ARGOS M to a maritime lien, so how could it legally allow a contractor/purported agent (AUM) to do the very thing it was prohibited from doing?

This crucial inquiry cannot be answered without examining the antecedent charter and what the law governing *that contract* allows or prohibits in terms of subsequent contracts, to determine whether the later-in-time contract survives authority-related prohibitions in the antecedent contract. However, as noted above, that inquiry does not appear to have been addressed by courts within this Circuit in this maritime lien context, and it forms a significant one for the maritime industry, especially in light of the volume of maritime trade conducted in, on, and around U.S. waterways.

## II.    *Echoing Judge Oldham's dissent, disregarding the antecedent charterparty contract in a choice-of-law analysis violates contract law.*

The Argos-Shimsupa charterparty has a consequential effect on the corollary choice-of-law issues here. It is undisputed that the charterparty contained numerous "no lien" clauses that prohibited Shimsupa from allowing or incurring any lien on the Vessel, in addition to requiring Shimsupa to inform bunker sellers in writing that no lien would be allowed on the Vessel.[43] As Judge Oldham summarized, "[a]lthough Shimsupa had authority to purchase bunkers, the charterparty forbade Shimsupa from entering any contract that might permit a maritime lien or any other right to be exercised over the ARGOS."[44]

The majority opinion explicitly recognized that the "no-lien" clauses divested Shimsupa of authority to bind the Vessel: "No actual authority existed because, regardless of whether Shimsupa gave actual authority to AUM to secure necessaries and bind the vessel, Shimsupa lacked authority to enter an agreement reserving the possibility of a maritime lien under the charterparty."[45] This "lack[] [of] actual authority to enter an agreement reserving the possibility of a maritime lien under the charterparty" is obviously at odds with the lien clause contained in TFM's GTCS,

---

[43] R. Doc. 92, p. 3.
[44] R. Doc. 92, p. 32.
[45] R. Doc. 92, p. 13 n.7.

precipitating the consequential questions of whether AUM (purportedly on behalf of Shimsupa) was authorized to enter into the bunker contract it did with TFM and then which terms within the AUM-TFM contract (if any) can survive Shimsupa's lack of actual authority to bind the Vessel to any lien-related encumbrances.

Owing to this inherent conflict between the contracts, Judge Oldham recognized the significant practical question as to interpreting the interplay between these contracts, especially since the Argos-Shimsupa charterparty undisputedly preceded the AUM-TFM bunker contract.[46]

While "[t]he threshold issue in this case is whether Shimsupa could somehow expose Argos Bulkers' boat to a maritime lien by [AUM] signing Three Fifty's bunker contract," "the charterparty also made it very clear that, in purchasing bunkers, Shimsupa was absolutely positively prohibited from doing anything that might expose the ARGOS to a maritime lien."[47] As Judge Oldham recognized, Argos undisputedly was not a party to the AUM-TFM contract, such that application of the TFM choice-of-law clause has the effect of inappropriately "overrid[ing] [Argos] and [Shimsupa]'s choice of law in an earlier contract."[48]

The majority did not cite any legal authority for elevating the choice-of-law

---

[46] R. Doc. 92, pp. 30-40.
[47] R. Doc. 92, p. 34.
[48] R. Doc. 92, p. 37.

clause from TFM's contract over the protective "no lien" clauses in the earlier-in-time charterparty. And as Judge Oldham observed, this Honorable Court's *BULK JULIANA* decision does not require elevation of the bunker contract's terms over the charterparty clauses.[49] Moreover, to the extent the notion could apply under whichever law ultimately governs a particular lien dispute, the fact that any presumption of a charterer's authority to bind the vessel is only a *presumption* means it can be defeated with evidence like "explicit contractual terms stating a charterer cannot bind the vessel."[50] As Judge Oldham convincingly argues, undisputed evidence of "no lien" provisions precluding Shimsupa from entering into any agreement that could encumber the ARGOS M should constitute sufficient grounds upon which to rebut any statutory presumptive authority that may be applicable.

Turning to the problematic effect of disregarding the antecedent charterparty, there exists the real question of whether the prohibitive terms therein render the AUM-TFM contract void *ab initio* or whether those prohibitive terms have the effect of severing certain provisions from the AUM-TFM contract that cannot survive the Argos-Shimsupa charter's prohibitions.[51]

---

[49] R. Doc. 92, p. 37.

[50] R. Doc. 92, p. 38.

[51] For example, to the extent English law would govern the inquiry relative to the interplay of the antecedent charterparty with the later-in-time AUM-TFM contract, it appears English law recognizes the concepts of severability and nullity in the contract realm as well. *See, e.g., Martinez*

By wholly disregarding the antecedent charterparty, in which Argos clearly evidenced the materiality of protecting the Vessel (and itself) from the harsh remedy of maritime liens by including *several* explicit and unambiguous provisions prohibiting them and/or prohibiting Shimsupa from actions that could lead to same,[52] the district court effectively elevated the AUM-TFM contract over the "freely negotiated" contract terms of the Argos-Shimsupa charterparty, an outcome that is at odds with this Court's recognition of "freely negotiated" contract terms.

This Court remarked in its *BULK JULIANA* decision that "[o]wners of ocean-going vessels are by their nature internationally oriented, sophisticated, and fully able to protect themselves contractually in their dealings with time charterers from any perceived unfairness by the possible enforcement of maritime necessaries liens in U.S. ports." 822 F.3d at 773. As vessel owner here, ***Argos did just that***. It protected itself contractually and comprehensively in the charter, yet a subsequent contract (the terms of which it had no notice until this suit) destroyed its principled efforts. Short of monitoring everything the vessel does while under the direction of the charterer, which would not only defeat the commercial purpose of a time charter but would also be impossible, what more could Argos commercially reasonably have

---

*v. Bloomberg LP*, 740 F.3d 211, 225 (2d Cir. 2014); *SAS Inst. Inc. v. World Programming Ltd.*, 64 F.Supp.3d 755, 774 (E.D.N.C. 2014), *aff'd in part, vacated in part,* 874 F.3d 370 (4th Cir. 2017).
[52] See R. Doc. 92, p. 32.

done? This (rhetorical) query echoes the policy concern that the First Circuit raised many years ago in *Tramp Oil & Marine, Ltd. v. M/V Mermaid I*: "Appellee persuasively points out that if any one of a series of intermediate brokers with no relationship to the vessel could impose a maritime lien, a vessel seeking to avoid a lien would be forced to delve far deeper into every transaction than is commercially reasonable." 805 F.2d 42, 46 (1st Cir. 1986).

Given the realities of the shipping industry today, where shipowners often do all they can to contractually protect themselves against downstream entities encumbering their vessels without their knowledge, but necessaries suppliers do their best to remain willfully blind to the prevalence of "no-lien" clauses, this Court should consider this issue so that the unambiguous terms of a charterparty remain effective.

III.    *As a corollary inquiry with a choice-of-law clause that seeks to bind a non-party vessel, any required agency analysis must be performed under foreign law, as it necessarily must precede the application of U.S. law.*

The issue discussed herein is further implicated in the choice-of-law piece of the majority's decision by its application of the incorporated terms against the Vessel despite evidence that at best they were *only* ever sent to AUM – not the owner or charterer of the ARGOS M.[53] This determination, critical to the choice-of-law

_____

[53] ROA.3173.

analysis, *assumes* that AUM was an agent of the charterer; otherwise, there would be no vessel-related party that received the GTCS (although Argos reiterates that the GTCS were not received by *anyone* until after contract performance commenced and completed). Yet the conclusion that AUM was an agent could not yet be reached under U.S. law, because the majority had already decided that U.S. law did not apply to the governing contract in its own right, thus creating another "barge before the tug" situation. *DeNicola v. Cunard Line, Ltd.,* 642 F.2d 5, 7 n.2 (1st Cir. 1981).

In the *BULK JULIANA*, this Court recognized that the bunker contract was directly with the vessel's charterer (Denmar), and other pertinent jurisprudence applying the lien-seeking party's choice-of-law clause likewise reflects contracts ***directly with the charterer***. *E.g.*, *Trans-Tec*, 518 F.3d at 1122-23, 1125-26; *Glander Int'l Bunkering Inc. v. M/V Dvina Gulf*, No. CV195206, 2022 WL 950995, at \*1-2 (D.N.J. Mar. 29, 2022); *Topoil AB v. M/V ORUC REIS*, No. CV H-15-460, 2016 WL 11474777, at \*1-2, 5 (S.D. Tex. Aug. 25, 2016); *World Fuel Servs. Trading, DMCC v. M/V HEBEI SHIJIAZHUANG*, 12 F.Supp.3d 792, 795-97, 804 (E.D. Va. 2014); *OceanConnect.com, Inc. v. M/V FESCO ANGARA*, No. 2:09-1694, 2012 WL 3835098, at \*4 (W.D. La. Aug. 31, 2012); *cf. Liverpool & London S.S. Prot. & Indem. Ass'n Ltd. v. QUEEN OF LEMAN MV*, 296 F.3d 350 (5th Cir. 2002) (applying choice-of-law clause against vessel owner where prior owner had entered into the

pertinent insurance contracts).

Left unanswered by the *BULK JULIANA* and other decisions is whether, when the bunker contract is undisputedly with an entity other than the owner or charterer, the choice-of-law analysis to determine whether the lien-seeker's terms can be incorporated and enforced against the vessel must examine agency principles under the law dictated by the outcome of the predicate *Lauritzen* analysis. Argos submits it should. This unanswered question underscores the importance of determining the effect of the antecedent charter where the question presented is one of incorporated terms and conditions.

## <u>CONCLUSION</u>

Charterparties are an everyday reality in the universe of maritime trade, and those freely negotiated terms should mean something contractually. As Judge Oldham emphasized in dissent, disregarding the terms of an antecedent charterparty in favor of elevating a U.S. choice-of-law clause in a third-party contract performed in Spain (by foreign traders, financiers, and suppliers) does not comport with fundamental notions of contract law where the party entering the subsequent contract lacked authority to agree to certain provisions. The lack of clarity in harmonizing these maritime contracts presents a question of exceptional importance, particularly considering the volume of maritime cases that come

through this Honorable Court and the frequency with which questions of foreign law are encountered.

As such, Argos respectfully requests that this Honorable Court grant its Petition for *En Banc* Consideration and address the issue identified herein.

Respectfully submitted,

**MURPHY, ROGERS, SLOSS, GAMBEL & TOMPKINS**

*/s/ Tarryn E. Walsh*

Peter B. Sloss       (#17142)
psloss@mrsnola.com
John H. Musser, V (#22545)
jmusser@mrsnola.com
Tarryn E. Walsh    (#36072)
twalsh@mrsnola.com
701 Poydras St., Suite 400
New Orleans, LA 70139
Telephone:  504.523.0400
Facsimile:   504.523.5574
*Attorneys for Argos Bulkers, Inc., solely as owner and claimant of the M/V ARGOS M, with a full reservation of all rights and defenses pursuant to Supplemental Rule E(8) of the Federal Rules of Civil Procedure*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby

certify that on this February 16, 2026, the foregoing Defendants-Appellants' Petition

for Rehearing *En Banc* was filed and served via the Court's CM/ECF Filing System

upon counsel for Plaintiff-Appellee, R. Chauvin Kean and Bradley J. Schlotterer of

Kean Miller, LLP, both of whom are registered CM/ECF users.

> */s/ Tarryn E. Walsh*
> Tarryn E. Walsh (#36072)
>
> *Attorney for Argos Bulkers, Inc., solely as owner*
> *and claimant of the M/V ARGOS M, with a*
> *full reservation of all rights and defenses*
> *pursuant to Supplemental Rule E(8) of the*
> *Federal Rules of Civil Procedure*

## CERTIFICATE OF COMPLIANCE

1.    Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this Petition complies with the type-volume limitations of Federal Rule of Appellate Procedure 40(d)(3)(A) because it contains 3,894 words (including the Statement of Counsel).

2.    This Petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the Motion has been prepared in Microsoft Word for Microsoft 365, using proportionally spaced, 14 point Equity serif typeface, except that footnotes are in 12 point font.

_/s/ Tarryn E. Walsh_
Tarryn E. Walsh (#36072)

*Attorney for Argos Bulkers, Inc., solely as owner and claimant of the M/V ARGOS M, with a full reservation of all rights and defenses pursuant to Supplemental Rule E(8) of the Federal Rules of Civil Procedure*

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 2, 2026

Lyle W. Cayce
Clerk

————————

No. 24-30413

————————

THREE FIFTY MARKETS, LIMITED,

*Plaintiff—Appellee*,

*versus*

ARGOS M M/V, HER ENGINES, TACKLE, EQUIPMENT, APPURTENANCES, ETC., *in rem*; ARGOS BULKERS, INCORPORATED, *as owner and claimant of the M/V Argos M*,

*Defendants—Appellants*,

——————————————————————

PMG HOLDING SRL

*Plaintiff*,

*versus*

ARGOS M M/V, HER ENGINES, TACKLE, EQUIPMENT, APPURTENANCES, ETC., *in rem*,

*Defendant—Appellant*.

——————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC Nos. 2:23-CV-595, 2:23-CV-623

——————————————————————

Before DENNIS, OLDHAM, and DOUGLAS, *Circuit Judges*.

No. 24-30413

Dᴀɴᴀ M. Dᴏᴜɢʟᴀs, *Circuit Judge*:

Three Fifty Markets, Ltd. ("Three Fifty") is an international commodity trading company that supplies marine fuel oil, also known as bunkers, to vessels. In July 2022, the M/V ARGOS M (the "vessel") was time chartered to Shimsupa GmbH ("Shimsupa"). Due to Shimsupa's poor creditworthiness, AUM Scrap and Metals Waste Trading LLC ("AUM") guaranteed Shimsupa for the charter. In early October 2022, purportedly on Shimsupa's behalf, AUM contacted a bunker broker, BunkerEx, Ltd. ("BunkerEx"), seeking bunkers for the vessel. BunkerEx then contacted Three Fifty, received a quote, and sent it to AUM. Tight on time, AUM confirmed the price, and the bunkers were delivered. Three Fifty issued an invoice, but neither AUM nor Shimsupa ever paid. Three Fifty sought a maritime lien against the vessel. Following a bench trial, the district court granted the lien. We AFFIRM.

I

A

This case concerns a complex web of transactions among several maritime entities. The M/V ARGOS M is a Liberian-flagged cargo vessel owned by Argos Bulkers ("Argos"). At all pertinent times, the vessel was managed by Pontos Marine, Inc. ("Pontos"). On July 28, 2022, Argos time chartered the vessel to Shimsupa, a company formed under the laws of Germany. Under the time charter, Shimsupa controlled the vessel's routes and the ports at which it called and traded; it was also responsible for replenishing any bunkers consumed by the vessel while trading on its account. AUM, a UAE-based entity and Shimsupa's sister company, guaranteed "each and every obligation" under the charter "unconditionally," including in the event of default.

No. 24-30413

The time charter contained numerous "no-lien" clauses. Shimsupa could "not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel." Clause 52 stated that Shimsupa must seek bunkers on its own behalf, and that the vessel and owners would not be responsible for such bunkers. Clause 109 expressly prohibited Shimsupa from suffering or permitting to be continued any lien "in respect to the supply of bunkers." Instead, it had to "inform the sellers of the bunkers in writing . . . that the bunkers to be supplied to the Vessel are solely for the Charterers' account" and that no lien would be permitted on the vessel.[1]

In early October 2022, Fahim Shamsi, an AUM employee,[2] contacted BunkerEx seeking fuel bunkers for the vessel from Las Palmas, Spain. Dean Tennant, representing BunkerEx, reached out to Aaron Loveman, president and owner of Three Fifty, a trading company organized under the laws of the United Kingdom. He requested 800 metric tons ("mt") of Very Low Sulphur Fuel after representing to Three Fifty that AUM was authorized to act on Shimsupa's behalf.

Tennant obtained only that one quote—for $787/mt—which he relayed to AUM representative Fahim Shamsi.[3] Although Shamsi identified

---

[1] Argos argues that the district court clearly erred in finding that Shimsupa could direct AUM to order bunkers on its behalf. But the record clearly shows that Shimsupa could direct AUM to order the bunkers on its behalf. The charter party does not preclude assignment of this duty to an agent, and Argos ratified the conduct by failing to object when it was notified that AUM had made the purchase.

[2] The district court referred to Shamsi as "an AUM and Shimsupa employee." This fact was supported by testimony. Indeed, one witness stated that Shamsi had email addresses with both companies.

[3] Argos speculates that Tennant only retrieved one quote "[p]erhaps because of AUM's known payment problems." To the contrary, the record suggests that Three Fifty was the only available quote because of the short turnaround.

the rate as $80/mt over the market price, he accepted the deal.  At no time did AUM direct BunkerEx to contact Three Fifty or otherwise orchestrate the subcontracting process; in fact, AUM was unaware of the seller's identity until the order was confirmed.  And after learning that AUM was the buyer and Shimsupa the charterer, Three Fifty never contacted them to verify their connection.  BunkerEx emailed the official confirmation sheet, which identified AUM as the buyer, to Shamsi's AUM email address.[4]

Alongside the Order Confirmation, the email stated that Three Fifty's "General Terms and Conditions of Sale ("GTCS") will apply to this contract, a copy of which is available on request."  Neither AUM nor Shimsupa objected to the Order Confirmation or the GTCS.[5] *See* Three Fifty's GTCS included the right to exercise a lien, and a choice-of-law clause identifying United States law as applying "with respect to the existence of a maritime lien."

Three Fifty contracted down a chain of entities for the fuel supply, with Oryx ultimately serving as the physical supplier, and the bunkers were stemmed aboard the vessel in Las Palmas, Spain, on October 11, 2022.  Three Fifty issued an invoice to AUM on November 7, 2022, with a due date of November 10, 2022.  AUM never paid, nor did Shimsupa, Argos, or Pontos.  Three Fifty filed a Verified Complaint in the Eastern District of Louisiana

---

[4] Argos highlights the Order Confirmation's "buyer" label, and claims that Three Fifty and Tennant thought that AUM was the charterer at the time of the stem.  But testimony cuts against this point.  To the extent that Three Fifty's Complaint referred to AUM as a charterer, Three Fifty's counsel admitted error.

[5] Argos does not argue that Shimsupa or AUM objected after receiving the Order Confirmation.  While it asserts that Three Fifty never directly transmitted the GTCS to any entity, the district court found that "the GTCS was attached to the email."

No. 24-30413

requesting a maritime lien on the vessel and that it be arrested in the Port of New Orleans.  The vessel was arrested, and Argos posted bond.

## B

On March 21, 2023, Argos appeared as claimant of the vessel and answered the Complaint.  The parties cross-moved for summary judgment, but the district court denied both motions, ruling that there were genuine disputes of material fact.

On February 26, 2024, the court held a bench trial, at which Three Fifty called two witnesses: Loveman and Alan Swimmer, an employee of National Maritime Services.  Three Fifty submitted the transcripts of Tennant's and Argos's corporate depositions.  At the conclusion of Three Fifty's case, Argos moved for dismissal under Federal Rule of Civil Procedure 52(c).  The district court denied the motion because of the factual nature of the dispositive issues.  After trial, Argos filed various hearsay objections to the deposition testimony, which the district court overruled. The court ordered further briefing on the choice-of-law issue.

The district court then issued its Findings of Fact and Conclusions of Law.  The court found that the choice-of-law provision was effective because no parties objected to the GTCS after receiving them.  It then found that a maritime lien existed in favor of Three Fifty because AUM had apparent authority to bind Shimsupa, and therefore presumptive authority to bind the vessel.  It ordered that Three Fifty was entitled to $629,000 for the fuel provided, plus $61,511.06 in prejudgment interest and $31,530.73 in *custodia legis* expenses.  This appeal followed.

## II

Before venturing into whether the district court properly recognized a maritime lien, we must determine the law governing this dispute.

A

We "review[] questions of law, 'including choice of law and contract interpretation, de novo.'" *World Fuel Servs. Sing v. Bulk Juliana M/V*, 822 F.3d 766, 770 (5th Cir. 2016) (quoting *Waterfowl Liab. Co. v. United States*, 473 F.3d 135, 141 (5th Cir. 2006)).  The district court relied on American maritime law governing choice-of-law provisions to determine that American law governs the dispute.  This presupposes that American law governed the contract's formation, or otherwise controls.  Argos contends, however, that the district court should have conducted a choice-of-law analysis to determine what country's law governed the contract's formation.  Then, using *that* country's law, the district court should have determined whether the choice-of-law provision was validly incorporated by reference.  If so, United States maritime law controls.  If not, then the law of the country in which the contract was formed controls.

Where there is no "contractual choice-of-law clause, federal courts sitting in admiralty apply federal maritime choice-of-law principles derived from the Supreme Court's decision" in *Lauritzen v. Larsen*, 345 U.S. 571 (1953).  *Triton Marine Fuels Ltd., S.A. v. M/V PACIFIC CHUKOTKA*, 575 F.3d 409, 413 (4th Cir. 2009) (quoting *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1296 (9th Cir. 1997)). But where there *is* a choice-of-law provision and its effectiveness is disputed, "a preliminary choice of law, based on maritime law principles, must be made as to the contract's formation." *Bulk Juliana*, 822 F.3d at 771.  If the choice-of-law provision is not on the face of the contract but separately incorporated, the question becomes whether the terms are "validly incorporated into the contract," which is answered by the law governing the contract's formation. *Id.*

In *Lauritzen*, the Supreme Court "identified seven factors 'which, alone or in combination, are generally conceded to influence choice of law to

govern a tort claim.'" *Trans-Tec Asia v. M/V HARMONY CONTAINER*, 518 F.3d 1120, 1124 (9th Cir. 2008) (quoting *Lauritzen*, 345 U.S. at 583). Courts generally use these factors, alongside others from the Restatement (Second) of Conflict of Laws § 188, to determine the law governing contract formation. *See, e.g., id.*; *Gulf Trading & Transp. Co. v. The Vessel Hoegh Shield*, 658 F.2d 363, 366–67 (5th Cir. 1981)). Under this analysis, we first consider the original *Lauritzen* factors: (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance of the injured party; (4) the defendant shipowner's allegiance; (5) the place of contract; (6) the inaccessibility of a foreign forum; and (7) the law of the forum. *Trans-Tec*, 518 F.3d at 1124. We then consider "[(8)] the place of negotiation of the contract, [(9)] the place of performance[,] and [(10)] the place of business of the parties." *Id.*

This *Lauritzen*-plus analysis produces the following results: (1) the wrongful act (nonpayment) occurred in one of Spain, the UAE, or Greece; (2) the vessel flew the Liberian flag; (3) the injured party comes from the United Kingdom; (4) the shipowner is of Greek allegiance; (5) the contract was formed in Spain; (6) foreign fora are not inaccessible—the vessel was merely seized in the Eastern District of Louisiana; (7) the forum is the United States; (8) the contract was negotiated in either the UAE or the United Kingdom through electronic means; (9) the place of performance was Spain; and (10) the domicile, residence, place of incorporation, and place of business of each party was, respectively, the UAE and the United Kingdom, while the vessel's operator was of Greek allegiance.

It is not obvious which country's law governs from an initial review; after all, six countries' hands are in the pot. But the Ninth Circuit's *Trans-Tec* decision, expanding on *Lauritzen*, sheds additional light. There, the court of appeals explained that while the shipowner's nationality and the law of the flag are substantial contacts, the mere fact "[t]hat the bunkers were supplied in [Las Palmas, Spain], 'was dictated in large part by the fortuity of

the ship's location and intended route.'" *Trans-Tec*, 518 F.3d at 1125 (quoting *Gulf Trading & Transp. Co. v. M/V Tento*, 694 F.2d 1191, 1195 (9th Cir. 1982)); *see also Fogleman v. ARAMCO*, 920 F.2d 278, 282 (5th Cir. 1991) (explaining, in a tort suit, that "[t]he law of the flag has traditionally been of cardinal importance in determining the law applicable to maritime cases" but that "[t]he place of the wrongful act is accorded little weight in traditional maritime cases, in which the locality of the ship changes constantly"). This drops Spain out of consideration. And the UAE does not prevail either, because "the place where negotiation of the contract occurred . . . does not weigh in favor of applying any one sovereign's law." *Trans-Tec*, 518 F.3d at 1125; *accord Fogleman*, 920 F.2d at 283 (explaining, in a tort suit, that "[t]he place of the contract [is] of little import due to its 'fortuitous' occurrence for the traditional seaman" (quoting *Lauritzen*, 345 U.S. at 589)). After all, "the bunker contract was formed through a series of emails and facsimiles" between the parties, *Trans-Tec*, 518 F.3d at 1125, and AUM is not a party to this proceeding. This leaves Greece and the United Kingdom.[6]

We can bypass the choice-of-law question entirely if each country's laws produce the same results. *See Schneider Nat'l Tansp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002) ("If the laws of the states do not conflict, then no choice-of-law analysis is necessary." (quoting *W.R. Grace & Co. v. Cont'l Cas. Co.*, 896 F.2d 865, 874 (5th Cir. 1990))). A cursory review tells us that these countries view maritime liens differently. *Contrast* William Tetley, *Maritime Liens and Claims* 1400 (2d ed. 1998) (explaining that in the United Kingdom, "[c]ertain statutes create 'special legislative rights' akin to maritime liens" and that there exist "statutory rights of action *in rem* . . .

---

[6] Argos conducted this analysis before the district court, concluding that Greek law controls; Three Fifty did not strongly dispute that result. Nevertheless, an independent analysis shows that it does not matter which country's law governs.

which, entitling arrest, create rights similar to a maritime lien"), *with Vestoil, Ltd. v. M/V M Pioneer*, 148 F. App'x 898, 900 (5th Cir. 2005) ("Greek law does not recognize a maritime lien for the provision of necessaries such as fuel oil and bunkers."). But that does not end the inquiry. Instead, we dive deeper into the maelstrom, asking whether the choice-of-law provision in the bunkering contract was properly incorporated by reference. We conclude that there is no conflict.

B

Here the record reflects that the district court applied United States law. "Under general contract principles, where a contract expressly refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both instruments are to be construed together." *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 267 (5th Cir. 2011). This tenet is no different for maritime contracts. *Id.* The contract must "make[] 'clear reference to the document and describe[] it in such terms that its identity may be ascertained beyond doubt.'" *Id.* at 268 (quoting 11 WILLISTON ON CONTRACTS § 30:25 (4th ed. 1999)). "Terms incorporated by reference will be valid so long as it is 'clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'" *Id.* (quoting 11 WILLISTON ON CONTRACTS § 30:25). Notice of incorporated terms exists when, "under the particular facts of the case, '[a] reasonably prudent person should have seen' them." *Id.* (alteration in original) (quoting *Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577, 582 (5th Cir. 1986)). Greek and United Kingdom law mirror these principles.

With respect to Greek law, our sister circuit's decision in *World Fuel Services Trading, DMCC v. Hebei Prince Shipping Co., Ltd.*, 783 F.3d 507 (4th Cir. 2015), is informative. There, the Fourth Circuit considered a remarkably

similar set of facts: a bunker invoice submitted to a vessel charterer was left unpaid, and the contracting party sought a maritime lien. *Id.* at 510–11; *see also id.* at 511 (vessel chief engineer attached a no lien stamp to the delivery notice). Relying on "declarations from Greek attorneys stating their respective opinions on whether and when terms are incorporated by reference," *id.* at 518, the court explained that "Greek contract law does not differ in any material respect from the corresponding principles of United States law," *id.* at 514. This includes incorporation by reference, which occurs when the provisions are "drafted in 'a clear, plain[,] and explicit way.'" *Id.* (quoting *World Fuel Servs. Trading, DMCC v. M/V HEBEI SHIJIAZHUANG*, 12 F. Supp. 3d 792, 804 (E.D. Va. 2014)).

United Kingdom law parallels the law of the United States on this subject. When determining whether terms are incorporated by reference, courts in the United Kingdom ask what "the document would convey to a reasonable person having all the background knowledge which would have been available to the parties in the situation in which they were at the time of the contract." *Rooney and Another v. CSE Bournemouth Ltd.* [2010] EWCA (Civ) 1364, 2010 WL 2131340 [14] (citation modified). Indeed, "the ultimate question [is] whether reasonable people, i[.]e[.] in the position of the parties, would understand the words used as referring to contractual terms upon which [the party] agreed to do the work." *Id.* at [15]. What one "would expect to occur to a businessman in the position of the parties" may be considered, *id.* at [16], and terms and conditions have been found to be incorporated where the contract stated merely, "terms and conditions available upon request," *id.* at [14].

The approach in the United Kingdom does not differ from American law in any meaningful way. Similar to the United Kingdom's analysis, we ask whether the contract made clear reference to the document and described it in such terms that, "under the particular facts of the case, '[a] reasonably

prudent person should have seen' them." *One Beacon*, 648 F.3d at 268 (alteration in original) (quoting *Coastal Iron Works*, 783 F.2d at 582).

This leaves one final question: were the GTCS validly incorporated by reference? The Order Confirmation explained that the GTCS would apply to the contract and that they were "available on request." Neither AUM nor Shimsupa ever objected to the GTCS or Order Confirmation, nor did Pontos or any other entity object to the order details. And some evidence supports the district court's finding that the GTCS were directly emailed to AUM. There was (1) clear reference to the document—by its title—in the Order Confirmation, and (2) any reasonably prudent party would have had notice either through the alleged email attachment or by requesting it. This is sufficient to incorporate the provision by reference under American law, and, because Greek and United Kingdom law do not compel a different result, the choice-of-law provision is validly incorporated by reference. We therefore proceed to the merits, applying American law.

III

A

Under American law, maritime liens are governed by the Commercial Instruments and Maritime Liens Act ("CIMLA"). CIMLA provides that an individual supplying necessaries to a vessel "on the order of the owner or a person authorized by the owner" may secure a maritime lien on the vessel. 46 U.S.C. § 31342. "The following persons are presumed to have authority to procure necessaries for a vessel: (1) the owner; (2) the master; (3) a person entrusted with the management of the vessel at the port of supply; or (4) an officer or agent appointed by—(A) the owner; (B) a charterer; (C) an owner pro hac vice; or (D) an agreed buyer in possession of the vessel." 46 U.S.C. § 31341(a). CIMLA's provisions are treated "*stricti juris* to ensure that maritime lines are not 'lightly extended by construction, analogy, or

inference.'" *Valero Mktg. & Supply v. M/V ALMI SUN*, 893 F.3d 290, 292 (5th Cir. 2018) (quoting *Atl. & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 200–01 (5th Cir. 1979)).

We review de novo the grant of a maritime lien. *Cent. Boat Rentals, Inc. v. M/V Nor Goliath*, 31 F.4th 320, 323 (5th Cir. 2022). But some of the findings underlying the lien—including whether AUM had apparent authority to bind Shimsupa—are factual and therefore subject to clear-error review. *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220, 226 (5th Cir. 1999).

## B

Three Fifty bore the burden of demonstrating that (1) it provided necessaries; (2) the necessaries were provided to a vessel; (3) "the person who placed the order had authority to do so, either real, apparent, or statutorily presumed"; and (4) the supplier charged a reasonable amount. *Belcher Co. of Ala. v. M/V Maratha Mariner*, 724 F.2d 1161, 1164 (5th Cir. 1984). The parties did not dispute the first two requirements.

The district court rightly noted that CIMLA grants presumptive authority to certain entities when procuring necessaries for a vessel. *See id.* at 1163 ("This lien attaches when necessaries are ordered by and supplied to a charterer, unless the supplier has notice that the person who orders the necessaries lacked authority to do so." (footnote omitted)). It also recognized that the presumption may be rebutted by actual knowledge of a no-lien clause. *See Gulf Oil Trading Co. v. M/V CARIBE MAR*, 757 F.2d 743, 749 (5th Cir. 1985) (noting that knowledge of a no-lien clause eliminates the supplier's opportunity to enforce a maritime lien on a vessel), or some other lack of authority.

The district court concluded that Three Fifty "introduced ample evidence to demonstrate that AUM, acting on behalf of Shimsupa, ordered

No. 24-30413

the fuel bunkers from Three Fifty Markets via a bunkering service provided by BunkerEx." It cited testimony from Argos director Nikos Kekridis that he was aware of Shimsupa's working relationship with AUM, that he knew of its guarantee of obligations, that Pontos received the order details prior to delivery of the bunkers, and that no entity objected. Tennant also testified that he had extensive dealings with AUM, that it was his understanding that AUM and Shimsupa were related, and that AUM had full authority to purchase fuel bunkers on Shimsupa's behalf. The court referenced pre- and post-incident documentary evidence demonstrating AUM's authority.

## C

On appeal, Argos argues that Three Fifty failed to meet its burden of proof on the "authority" element. It separately argues that the district court should have applied the Fifth Circuit's general contractor-subcontractor line of cases because AUM was Shimsupa's general contractor and subcontracted the bunkering task down the line through BunkerEx to Three Fifty.

## 1

We must first ask whether AUM acted as an agent of Shimsupa, as the answer may dispose of the entire matter. As a refresher, under CIMLA, any officer *or agent* appointed by a charterer has "authority to procure necessaries for a vessel." 46 U.S.C. § 31341. Under the circumstances, the only way for AUM to demonstrate agency is through apparent authority.[7]

---

[7] Although Argos discusses actual and apparent authority, we need only consider apparent authority. No actual authority existed because, regardless of whether Shimsupa gave actual authority to AUM to secure necessaries and bind the vessel, Shimsupa lacked authority to enter an agreement reserving the possibility of a maritime lien under the charterparty. *See* Restatement (Second) of Agency § 7 ("[T]here is no authority

We "look to general principles of agency law and consider 'the roles of the parties in the transactions.'" *Lake Charles Stevedores*, 199 F.3d at 226 (citations omitted) (quoting *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, 869 F.2d 473, 477 (9th Cir. 1988)). "Unless the district court's findings regarding the existence of an agency relationship are clearly erroneous, we must accept those findings." *Id.* We consider "conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to the act done on his behalf by the person purporting to act for him." *Cactus Pipe & Supply Co., Inc. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir. 1985). This "is distinguished from actual authority because it is the manifestation of the principal to the third party rather than to the agent that is controlling." *Id.* Finally, "[a]n agent cannot confer authority upon himself." *Id.* "While agents are often successful in creating an appearance of authority by their own acts and statements, such an appearance does not create apparent authority." *Id.* at 1112 (quoting *Karavos Compania Naviera S.A. v. Atlantica Exp. Corp.*, 588 F.2d 1, 10 (2d Cir. 1978)).

Argos argues that Three Fifty failed to present sufficient evidence of apparent authority at trial. It highlights Loveman's testimony that he assumed that BunkerEx was AUM's agent, and that he had never spoken with AUM or Shimsupa previously. Therefore, Argos asserts that it was impossible for Shimsupa to manifest AUM's purported authority to Three Fifty. Indeed, Argos points out that the know-your-client form that AUM filled out for Three Fifty, which provided some insight as to the ownership structures of the entities, was not provided until after the transaction. It also

---

unless the principal has capacity to enter into the legal relation sought to be created by the agent.").

cites extensively to *Sing Fuels Pte Ltd. v. M/V Lila Shanghai*, 39 F.4th 263 (4th Cir. 2022), in which the court ultimately found no agency relationship.[8]

Despite this litany of arguments, Argos struggles to overcome the clear-error standard, under which we adopt factual findings "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, . . . even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 565 (1985). It is true that Loveman testified that he assumed that BunkerEx had authority to bind AUM, but, as described *infra*,[9] whether BunkerEx was AUM's agent is irrelevant to our analysis. The primary issue is whether AUM had apparent authority to act on behalf of Shimsupa. Several facts show that it did.

First, before the bunkers were delivered, Pontos and Shimsupa both received notice that AUM was the buyer. But no one objected; in fact, Kekridis testified that no one would pay attention to such a fact. Tennant testified that he had conducted between twenty-five and thirty bunker deals for the AUM account—and none for the Shimsupa account—because "AUM [was] always buying for their account when Shimsupa were charterers of the vessels." After all, it was his understanding that AUM could bind Shimsupa, and, in his course of dealing, no information contradicted such an understanding. Tennant also testified that the owner of both companies, Annamalai Subbiah, informed him "that AUM was authorized to order bunkers on [Shimsupa's] behalf." Although this

_____

[8] *Sing Fuels* is readily distinguishable, if for no other reason than that the district court there had found the lien-seeking entity's witnesses not to be credible and determined that it was not entitled to a maritime lien. *Id.* at 276. The court of appeals held that the district court had not clearly erred in light of the record as a whole. *Id.*

[9] *See infra* p. 23.

information was provided verbally, "it was quite well known, sort of, in the market, that they were . . . as good as the . . . same company." The district court also relied on the charterparty recap, which stated that "AUM and Shimsupa is [*sic*] sister companies, Aum [*sic*] based [in] Dubai [and] Shimsupa [in] Germany. [Ultimate benefit ownership] of both companies are same [*sic*]."

Moreover, Tennant informed Loveman of the agency relationship between Shimsupa and AUM.[10]  Tennant "recall[ed] Shimsupa . . . giving

---

[10] Argos asserts that these statements are "classic hearsay" because they were offered to prove the truth of the matter asserted. We review whether the district court erred in determining the admissibility of evidence for abuse of discretion. *United States v. O'Keefe*, 426 F.3d 274, 280 (5th Cir. 2005). The district court noted that the statements were not hearsay because of the opponent-party exception, reasoning that Shamsi's and Subbiah's statements were made as agents of the vessel through Shimsupa's time charter. Argos asserts that, because the individuals were AUM employees, they could not have been agents of the vessel. But this overlooks the fact that Subbiah had an ownership stake in Shimsupa and made the statement in his capacity as its owner, and that Shimsupa had become an agent of the vessel by and through the time charter. Argos's arguments do not show an abuse of discretion.

At any rate, the statements did not qualify as hearsay. Although there must be manifestations from the principal to the third party regarding the agent's authority, the chief inquiry is whether the third party acted reasonably when it relied upon any such manifestations or assurances. "Ordinarily, a statement is not hearsay if it is offered to prove the statement's effect on the listener." *United States v. Reed*, 908 F.3d 102, 120 (5th Cir. 2018). So, while the statement may be inadmissible hearsay to the extent that it was offered to prove that AUM in fact had authority to purchase on Shimsupa's behalf, it is admissible non-hearsay if it was offered to prove the impact it had on Three Fifty's and BrokerEx's states of mind. Here, it was offered to demonstrate Three Fifty's reliance upon the statement, and its reasonableness in doing so. This is a valid non-hearsay purpose.

Argos also contends that the statements lacked circumstantial guarantees of trustworthiness. But there is no reason to dispute Tennant's statement. Physical exhibits demonstrated that Tennant *did* inform Three Fifty that Shimsupa was the charterer and that Shimsupa ultimately represented that AUM was authorized to place the order for bunkers on its behalf. Because these statements were admissible, even if the district court erred in its opposing-party determination, any error was harmless.

authority to AUM to [order bunkers] on multiple occasions, [and] on this one specifically as well." Tennant was also informed that Shimsupa—not AUM—was the charterer of the vessel, a fact "disclosed on every stem." AUM was selected because it was "deemed a better credit risk."

Loveman, for his part, testified that AUM "act[s] on behalf of Shimsupa," relying on his three previous stems with AUM. The know-your-client form that Loveman received after supply corroborated this fact, noting that AUM and Shimsupa "shared the same founder and owner." Although the form arrived after the transaction, that information is also "on both of their websites." As both Tennant and Loveman explained, it is "industry practice" to rely on a broker, and to make such deals and assurances verbally. There is no reason to discount this testimony.

When determining whether apparent authority exists, "all accompanying circumstances" are considered, including "the situation of the parties, their relations to one another, and the business in which they are engaged"; general usages of business and the trade to which the authorization relates, including the principal's business methods; and various other considerations. Restatement (Second) of Agency § 34. Tennant directly informed Three Fifty that, in his significant experience with AUM and Shimsupa, AUM always purchased bunkers on Shimsupa's behalf. He also stated that Shimsupa's *owner* told him, with reference to this very transaction, that AUM was authorized to bind Shimsupa. Furthermore, after receiving the invoice noting AUM as the purchasing agent of bunkers, Shimsupa and S.S. Freight Solutions failed to object; for their part, Pontos and the vessel did not object to AUM's role in purchasing the fuel. *See* Restatement (Second) of Agency § 94 ("An affirmance of an unauthorized transaction can be inferred from a failure to repudiate it."). There is sufficient evidence supporting Three Fifty's belief that AUM was authorized to act on Shimsupa's behalf (and therefore

the vessel's), even if it did not directly contact the purported principal to verify that fact.

The question then turns into one of reasonableness. In transactions for necessaries, offers and deals are generally made verbally. Fuel traders, when contacted by fuel brokers, do not frequently speak to the charterer itself. And it was known that Shimsupa and AUM "were linked and had authority to buy bunkers on [each other's] behalf." That the industry widely abides by a specific practice, and that a course of dealing has suggested that AUM consistently purchases fuel on Shimsupa's behalf,[11] supports a finding of reasonableness. Pair that with the district court's finding that the witnesses' statements were credible and Shimsupa's owner's comments that AUM could bind it, and the record supports a finding of reasonableness.

Post-incident evidence also corroborates this pre-incident testimony. Chiefly, Three Fifty provided post-incident email correspondence from Subbiah demonstrating that AUM had authority to purchase the bunkers on Shimsupa's behalf. In response to BunkerEx CEO Ishaan Hemnani's

---

[11] Argos claims that course of dealing may not be considered because maritime liens are only to be found *stricti juris*. Because the bunkers in the previous dealings were for different vessels, it argues, past or prior dealings would involve different ports, terms, and parties. While there is some merit to this argument, it cannot defeat Shimsupa's owner's comments regarding AUM's agency, nor can it overcome the district court's other findings.

Argos alternatively claims that, since maritime liens are only to be granted *stricti juris*, Three Fifty's failure to provide documentary evidence of the prior transactions means that they cannot be considered. But Argos provides no law supporting this statement. Black's Law Dictionary defines *stricti juris* as "[o]f strict right of law; according to the exact law, without extension or enhancement in interpretation." *Stricti juris*, *Black's Law Dictionary* (10th ed. 2014). There is no suggestion that only particular types of evidence may be considered. Argos's only other citation is to a distinguishable Fourth Circuit opinion in which the district court had found that there was no apparent authority, relying in part on the fact that the individual claiming prior transactions lacked credibility. *See Sing Fuels*, 39 F.4th at 276.

inquiry regarding AUM's authority, Subbiah responded stating that AUM "had full authority from [Shimsupa] to purchase the bunkers." This email was sent approximately five months after the bunker supply.[12]

The district court also relied on an email sent from Shimsupa's accounts payable email address. The email acknowledged that Shimsupa had not yet paid the debt it owed Three Fifty, explaining that it was searching for alternative banking options because its initial bank refused to proceed with any Venezuelan-related trade transactions. It concluded: "Hopefully we will be able to clear off all the pending overdue payments by the next week onwards prior to year end and we will be able to normalize our banking operations and start the new year with great business expectation." This email was transmitted to Subbiah's AUM and Shimsupa addresses, Biju's AUM address, Fahim Shamsi's AUM address, Ishaan Hemnani's BunkerEx address, and two additional Shimsupa-affiliated individuals' addresses.

Indeed, although the district court did not mention it, another email from Tennant confirming the invoice indicated his understanding that AUM was operating on Shimsupa's behalf, bolstering his testimony. On November 7, 2022, he sent the official invoice to Annamalai's AUM address, Biju's AUM address, Shimsupa's accounts payable address, S.S. Freight Solutions' operation address, two additional AUM addresses, and one additional S.S. Freight Solutions address.

While the email correspondence alone cannot demonstrate authority, *see, e.g.*, *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 70 (2d Cir. 2003)

---

[12] Confusingly, this email came from another individual's email address—that of "Biju" of AUM—but was signed by Subbiah. Tennant testified that while "it states at the top that it's from Biju at AUM, . . . I know it's from Anna [Subbiah]. I think it was sent on his behalf." The district court accepted this testimony as credible.

(explaining that reliance must come from manifestations provided at the time of contracting), it places the testimony and other evidence in context. There is, therefore, no legitimate argument against the proposition that AUM had apparent authority to bind Shimsupa. Because this creates presumptive authority under CIMLA, we turn to whether Three Fifty may be granted a maritime lien.

2

Our circuit has traditionally observed two lines of cases when "an entity supplying necessaries to a vessel [lacks] privity of contract with the owner of that vessel, . . . instead contract[ing] with an intermediary." *Valero*, 893 F.3d at 293. These are "the general/subcontractor line of cases and the principal/agent, or 'middle-man,' line of cases." *Id.* When determining which line of cases applies, "it is not whether an intermediary can be expected to supply the necessaries itself that distinguishes instances in which the actual suppliers have liens, but it is rather the nature of the relationship between each pair of entities that are involved in the transaction at issue." *Id.* (quoting *Lake Charles Stevedores*, 199 F.3d at 230).

Under the general contractor/subcontractor line, we have "treated physical fuel suppliers (*e.g.*, [Oryx]) as subcontractors and fuel traders (*e.g.*, [Three Fifty]) as general contractors." *ING Bank N.V. v. Bomin Bunker Oil Corp.*, 953 F.3d 390, 394 (5th Cir. 2020). So too has every other circuit. *Id.* And the distinction between contractors and subcontractors makes or breaks the case: "[G]eneral contractor[s] supplying necessaries on the order of an entity with authority to bind the vessel ha[ve] a maritime lien." *Id.* (quoting *Lake Charles Stevedores*, 199 F.3d at 229). But subcontractors are not "entitled to one unless they can show 'that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance.'" *Id.* (quoting *Lake Charles Stevedores*, 199 F.3d at 229). In these cases, the

party with authority to incur a lien upon the vessel under CIMLA directly contracts with the fuel trader or broker. *See, e.g.*, *id.* at 392 ("[T]hree separate contracts were executed. First, Tatsuo Consulting Limited . . . , a charterer of the Vessel, contracted with O.W. Bunker Malta Ltd. . . . to arrange for the supply of fuel." (footnote omitted)); *Valero*, 893 F.3d at 291 ("Almi Tankers S.A., an agent for the Vessel's owner Verna Marine Co. Ltd., contracted with O.W. Bunker Malta, Ltd., a fuel trader, to procure bunkers."). But the subcontractor physical *fuel supplier* seeks to enforce a maritime lien against the vessel.

The second line of cases stems from *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, 869 F.2d 473 (9th Cir. 1988), which involved a series of contracts with intermediaries—specifically, local and domestic agents—resulting in the ultimate provision of necessaries. *Ken Lucky*, 869 F.2d at 477–78. We have never clarified exactly when *Ken Lucky* is implicated, but it has traditionally not applied where physical fuel suppliers seek a maritime lien. *See ING Bank*, 953 F.3d at 394 n.6 (noting that *Valero* declined to apply *Ken Lucky*); *id.* at 394 n.7 (noting that the Ninth Circuit distinguished *Ken Lucky* under similar circumstances); *Bunker Holdings Ltd. v. Yang Ming Liber. Corp.*, 906 F.3d 843, 846 (9th Cir. 2018) (distinguishing *Ken Lucky* because "the critical factual admission present there" connecting the parties was missing). But since *Valero* explicitly recognized the validity of *Ken Lucky* in this circuit, it must apply in some circumstances.

Ninth Circuit case law suggests that *Ken Lucky* applies in a narrow set of circumstances. There must be a contractual line, which, at risk of oversimplification, runs as follows: entity with statutory authority contracts with another entity to supply necessaries, which then subcontracts with another entity to fulfill that duty. *See Yang Ming*, 906 F.3d at 845–46 (describing *Ken Lucky*). In *Ken Lucky*, the general contractor/subcontractor line of cases did not apply because the subcharterer, which had statutory

authority to incur a maritime lien on the vessel, "admitted that [the subcontractor] sold the bunkers to [the subcharterer], pursuant to an order originating from [the subcharterer]." *Id.* (citing *Ken Lucky*, 869 F.2d at 476–77. In other words, although there was an additional line of contracting like that typically seen in general contractor/subcontractor cases, the third entity contracted back directly with the first entity, thus bypassing the need for the second entity to possess any type of agency relationship with the main contractor.[13]

Our facts do not fit in the general contractor/subcontractor line of cases. There, each entity only contracts with the one prior (*i.e.*, A to B, B to C, and so on). For the final subcontractor—usually the physical supplier in these cases—to be granted a maritime lien, it must show "that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance." *Valero*, 893 F.3d at 293 n.6 (quoting *Lake Charles Stevedores*, 199 F.3d at 229). For that reason, it is tremendously difficult for a subcontractor to establish a lien on a vessel. But here, although there is a contractual line (AUM, on behalf of Shimsupa, to BrokerEx, to Three Fifty) that would perhaps suggest some level of subcontracting, Three Fifty's contract is directly with AUM—even if there was no direct contact between the entities.

These facts match *Ken Lucky*. As in *Ken Lucky*, there is a contractual line, but the subcontracting party—Three Fifty—sold the bunkers directly to AUM, which had made the purchase on behalf of Shimsupa and the vessel.

---

[13] In simplest terms, A (AUM) contracted with B (BrokerEx), which contracted with C (Three Fifty). But, as it relates to the deal at issue, C directly contracted with A. So, it does not matter whether B is an agent of A, because C is seeking to enforce the contract it directly entered into with A. In the general contractor/subcontractor line of cases, there is no direct contracting relationship between A and C.

No. 24-30413

The sole party in between them on the contractual chain was BunkerEx, which was merely a fuel broker, and not an intermediate entity connecting the other two through a contractual chain. This also fits our labeling of the "middleman" line of cases as "the agent/*broker*" line of cases. *See Crescent City Marine, Inc. v. M/V Nunki*, 20 F.3d 665, 667 (5th Cir. 1994) (emphasis added). The middleman would traditionally be the broker, which is exactly the role of BrokerEx.[14]

Finally, Argos's argument that the general contractor/subcontractor line applies—with AUM as the general contractor, thus requiring proof of an agency relationship with BrokerEx or some control over the selection of Three Fifty—must fail. The Ninth Circuit in *Ken Lucky* rejected this argument. Consider the following from that case[15]:

> The parties agree that *the order originated from Bulkferts*. Thus, we need not reach the question whether the district court's conclusion that Brook was not Bulkfert's agent is erroneous because appellees have already admitted that the fuel and bunkers were sold *to Bulkferts*. We conclude that Marine Fuel need not establish agency between Brook and Bulkferts to fall within the scope of one entitled to a maritime lien under the Act.
>
> Ken Lucky concedes that Bulkferts was authorized to bind the vessel. It is clear that Eurostem, as managing agent for Bulkferts, did order the fuel and it is also clear that Marine Fuel delivered the fuel *to the vessel*. Section 971 states that any person furnishing supplies or other necessaries *to a vessel*

---

[14] Of course, we do not hold that every time a fuel broker is involved, this line of cases applies, or that the intermediary need be a broker by trade. But the specific circumstances at bar clearly match the *Ken Lucky* line of cases.

[15] Bulkferts was the subcharterer of the vessel. Brook was a fuel brokering service, and Eurostem was Bulkferts's managing agent. Marine Fuel was the fuel supplier. *Ken Lucky*, 869 F.2d at 475.

No. 24-30413

> "upon" the order of a person authorized to bind the vessel
> shall be entitled to lien.  It is clear that Eurostem, as managing
> agent for Bulkferts, ordered the fuel, and it is also clear that
> Marine Fuel delivered the fuel *to the vessel*. Bulkferts had
> statutory authority to order the fuel under section 972 and it
> did so.  Marine Fuel delivered the fuel to the vessel after
> Bulkferts ordered it.

*Ken Lucky*, 869 F.2d at 477 (first emphasis added).  Three Fifty delivered the
fuel to the vessel after AUM ordered it on behalf of Shimsupa, which was
entitled to bind the vessel.  *Ken Lucky* controls.

Three Fifty satisfied the third requirement for a maritime lien—that
is, that the person who placed the order had authority to do so—and the
district court properly instituted a maritime lien on that basis.  We thus turn
to the fourth requirement, assessing the reasonableness of the price charged.

IV

A

In the maritime context, we measure the reasonableness of charges by
reference to those which are "customary."  *Ex Parte Easton*, 95 U.S. 68, 77
(1877).  The charges should be "in accord with prevailing charges for the
work done and the materials furnished."  *Sweet Pea Marine, Ltd. v. APJ
Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005) (quoting *Shelly Tractor &
Equip. Co. v. The Boots*, 140 F. Supp. 425, 426 (E.D.N.C. 1956)).  To prove
this element, "a plaintiff must present some modicum of evidence which
compares the charges claimed with what other competitors would have
charged for similar work or materials," and this requirement can be satisfied
"by witness testimony that the charges were reasonably in accord with
industry standards."  *Id.*  We review the underlying question of law de novo,

No. 24-30413

and the district court's fact findings for clear error. *See Martin Energy Servs., L.L.C. v. Bourbon Petrel M/V*, 962 F.3d 827, 830 (5th Cir. 2020).[16]

B

Argos contends that Three Fifty failed to provide evidence "to establish that other bunker traders would have charged a similar profit margin." Instead, it cites several district court cases in which courts cited markup values between one and four percent.

Argos moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c), stating that the "maritime lien claim can be maintained only with a favorable finding on both the authority and reasonable price elements of a lien claim." And it argued that there was "a lack of evidence that these bunkers were supplied at a reasonable price." In response, Three Fifty claimed that Argos failed to prove that the price was *unreasonable*, since Three Fifty had to "source" the fuel, "take the risk," extend credit, and "pay the broker." After hearing argument, the district court declined to rule explicitly on the reasonable charge issue, explaining that such questions are "pregnant with facts that doesn't really deal with a question of law." Ultimately, after finding that Three Fifty did in fact furnish necessaries on the order of an agent of the owner, it stated that it was "entitled to payment of its Invoice No. 1054 in the amount of $629,600.00."

Three Fifty questioned Loveman about how he devises his price. Loveman testified that he first considers "the price [he is] paying and then factor in the broker's fees, . . . the risk [he is] taking, and some profit for Three

---

[16] The district court made no explicit factual findings as to this issue, but implicitly found that the price was reasonable. Because there is relevant testimony in the trial transcript, we assume that the district court adopted those statements as fact in making its determination, given the lack of controverting evidence from Argos. We therefore review those facts and credibility determinations for clear error.

Fifty." Three Fifty also follows "the normal" practice of increasing prices to account for the credit it extends to its buyers. And since Three Fifty factors in various elements, its "price per metric ton . . . is always higher than the index price at the port." Evidence showed that the price was "80 more" than the market price on fuel bunkers, from $705.25/mt to $787/mt.

When questioned on cross-examination about whether the cost would have been lower if AUM had purchased bunkers directly from Sing Fuels, Loveman testified that he could not "give a definitive answer," because Sing Fuels could have charged above the index price. But to make a profit, Three Fifty marked up the price. And when questioned about whether he "wanted to make a lot of money," Loveman stated that he did not believe that "it was extortionate," instead referring to it as "industry standard." Testimony showed that Three Fifty charged a gross twelve percent increase in cost after consideration of the variables. But the broker fee—$17,600—dropped the net profit from twelve to approximately ten percent. Various other factors may have contributed to Three Fifty's quote: (1) Shimsupa's known creditworthiness issues; (2) issues specific to the port; and (3) the short turnaround. Considering all of these factors, we cannot say that the district court clearly erred in accepting the testimony.

Argos fails to convince us that this price was commercially unreasonable. The testimony showed that it is industry practice to upcharge based on various factors. The district court itself noted this reality, referring to various factors, including the spigot price, where the material was delivered, by whom, whether there is any sort of risk involved, what that risk is, and other extenuating circumstances, including "an impending hurricane, an impending storm." Whether a price is reasonable is, by all accounts, a highly fact-driven inquiry. And while Argos provides several district court opinions that show some companies' markup values (without discussing whether there is a ceiling on the "reasonableness" of the markup), each case

is distinguishable. *See, e.g.*, *Aegean Bunkering (USA) LLC v. Amazon*, No. 14-cv-9447, 2016 WL 4471895, at *2 (S.D.N.Y. Aug. 24, 2016) (1.3% markup on delivery of bunkers in Marcus Hook, Pennsylvania, nine days after contracting, with it unclear as to credit provided to vessel); *Hampton Bermuda Ltd. v. M/V STAR SIRANGER*, No. 05-3074, 2008 WL 1808550, at *1–3 (S.D. Tex. Apr. 18, 2008) (2.8% markup on delivery of bunkers in Savannah, Georgia, two or three days after contracting, with credit extended); *Bunkers Int'l Corp. v. M/V Wuchow*, No. 15-5221, 2016 WL 1161288, at *1 (E.D. La. Mar. 23, 2016) (1.3% markup on delivery of bunkers in Parangua, Brazil, three months in advance); *O'Rourke Marine Servs. L.P., L.L.P. v. M/V COSCO Haifa*, 179 F. Supp. 3d 333, 335 (S.D.N.Y. 2016) (3.7% markup on bunkers delivered in Houston, Texas, seven days after order).

Providing various instances in which district courts merely noted the cost of the bunker delivery and the markup without discussing reasonableness does not overcome testimony regarding industry practice, or suffice to compare the factual circumstances at issue in those cases with the circumstances here. Indeed, none of the bunkers in the above cases were delivered in Europe, much less in Las Palmas, Spain, nor were they delivered on the day of the order. Moreover, the most recent case was decided approximately nine years ago. Argos has not shown that the market has continued to charge markups at these rates.[17] No evidence contradicts Loveman's testimony as to how he marks up the fuel, or that it is industry practice to do so, and Argos cannot show that the cited markup values are the

---

[17] For instance, it is a very real possibility that the 2014–15 bankruptcy of O.W. Bunker, "formerly the world's largest supplier of fuel for ships," *Valero*, 893 F.3d at 292 (bankruptcy); *NuStar Energy Servs., Inc. v. M/V COSCO Auckland*, 760 F. App'x 245, 246 (5th Cir. 2019) (noting that O.W. Bunker filed for bankruptcy "shortly [after]" November 2014), has impacted worldwide fuel supplier markups.

ceilings of reasonableness.[18]    We therefore agree that the price was reasonable.

V

Argos asserts in a final catch-all issue statement that the district court clearly erred in various findings of fact, most of which we have already discussed.  The sole remaining fact disputed is Argos's knowledge that AUM and Shimsupa were controlled by the same individual and that AUM guaranteed the time charter obligations.  Beyond this fact's immateriality, the district court did not clearly err in making this determination.

Argos also claims that the district court did not grapple with two "undisputed pieces of . . . evidence" contradictory to its findings.  The evidence, both statements by Argos's owner, does not change the analysis.  First, Kekridis testified that it would make no sense to have AUM guarantee Shimsupa if they were effectively the same company.  It is unclear that this testimony demonstrates his view that AUM and Shimsupa were different entities.  Indeed, he stated that he "felt that with [AUM] we will have— although the same guy was behind, but we don't know who are the shareholders, we felt that this might be a pretty good guarantor in case that Shimsupa . . . fails."  This is far from an "undisputed piece[] of contradictory evidence" that would change any of the district court's analysis.

As to the second, Argos claims that Kekridis testified that AUM did *not* have authority to order bunkers for the vessel—only Shimsupa had that authority.  The basis of his statement was that the charter did not allow bunkering by the "time charterer, or someone else, or [the] guarantor," but

---

[18] The charter itself valued bunkers at $950/mt in the event that there was a disparity between the amount of fuel on the vessel when Shimsupa overtook its charter, and the amount of fuel that remained upon its return.

No. 24-30413

rather only provides that authority to the time charterer. This statement does not alter the apparent authority that Shimsupa provided to AUM with respect to Three Fifty, even if AUM had no authority in Argos's eyes. Moreover, Argos did not pay any attention to AUM's identification as the buyer of fuel for its vessel, suggesting that it expects or permits Shimsupa to delegate that responsibility. These arguments are unpersuasive.

## VI

Despite the Appellants' argument that the district court failed to conduct a choice-of-law analysis and declined to consider the general contractor/subcontractor lines of cases, the district court properly reached the conclusions that American law governs this dispute and that Three Fifty is entitled to a maritime lien on the vessel. For the foregoing reasons, we AFFIRM the judgment of the district court.

No. 24-30413

Andrew S. Oldham, *Circuit Judge*, dissenting:

Here is a stylized summary of this international maritime dispute: A ship owner (Party *A*) chartered its boat to a charterer (Party *B*). The *A-B* contract strictly forbade the charterer (Party *B*) from doing anything that could result in a maritime lien against Party *A*'s boat. Party *B* nonetheless entered a fuel contract with Party *C* that included—you guessed it—a provision that contemplated a maritime lien on Party *A*'s boat. Party *C* then sought a lien on Party *A*'s boat. The district court relied on the *B-C* contract to hold that a lien could be claimed—but it never considered the numerous choice-of-law questions posed by the *A-B* contract. Because we should have vacated the district court's decision and remanded for the district court to answer those questions, I respectfully dissent.

I

A

In *The Argonautica*, Apollonius of Rhodes recounts the tale of Jason and the Argonauts. Readers of Apollonius's epic will recall how Jason, under King Pelias's "ruthless command," voyaged to the Isle of Colchis with a cadre of heroes to retrieve the Golden Fleece from the sleepless watch of a dragon. Apollonius Rhodius, The Argonautica 117 (trans. R.C. Seaton 1912). Readers may also recall how Eros pierced Medea's heart, causing her to burn with love for Jason, *id.* at 213–15; how with Medea's help Jason met the awful challenge posed by Medea's father, King Aeetes, *id.* at 223, 259–89; and how Medea bewitched the once-sleepless dragon so that Jason could seize the fleece and flee, *id.* at 305.

But few may remember the story of the "sacred ship" that bore the heroes on their quest. *Id.* at 381. That ship was the *Argo*. Per the ancient bards, the craftsman Argus, working under the guidance of Athena, had built the *Argo* into "the most excellent of all ships that have made trial of the sea

with oars." *Id.* at 5, 11; *see also id.* at 145 (praising "Athena, who breathed into Argo divine strength when Argus knitted her together with bolts"). The *Argo* carried the Argonauts through "crashing rocks" on the journey to Colchis and through Scylla and Charybdis on the journey home. *Id.* at 141, 357. As the famed father of Achilles put it, the *Argo* was like a "mother," "for surely she b[o]re" the Argonauts "in her womb and groan[ed] unceasingly with grievous travailing," *id.* at 387, before delivering them safely home, *id.* at 415.

Today's case involves the *Argo*'s modern-day namesake: the M/V ARGOS M ("the ARGOS"). Although the ARGOS flies a Liberian flag, it is owned by Argos Bulkers, Inc., a corporation registered in the Marshall Islands and owned by Nikos Kekrides of Greece. And the ARGOS bears bulk cargo rather than heroes.



Like many vessel owners, Argos Bulkers does not use its vessel to ship its own cargo. Instead, Argos Bulkers enters contracts, called "charterparties," with shippers. Those shippers rent the ARGOS to ship their cargo.

No. 24-30413

In 2022, Argos Bulkers entered such a charterparty with a German entity named Shimsupa GmbH ("Shimsupa"). Under the charterparty, Shimsupa time-chartered the ARGOS. (For landlubbers, that means Shimsupa rented the ARGOS for a limited time.) Like many charterparties, this one required the charterer, Shimsupa, to provide its own "bunkers," or boat fuel.

Although Shimsupa had authority to purchase bunkers, the charterparty forbade Shimsupa from entering any contract that might permit a maritime lien or any other right to be exercised over the ARGOS. Two key provisions illustrate this point:

1. The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien, any encumbrance, or any rights of any kind whatsoever over the Vessel in respect of the supply of bunkers.

2. The Charterers shall . . . prior to ordering any bunkers for the Vessel inform the sellers of the bunkers in writing . . . that the bunkers to be supplied to the Vessel are solely for the Charterers' account, and that neither the Vessel, the Owners nor the Master is a party to the bunker supply contract.

Shimsupa had AUM Scrap and Metals Waste Trading LLC ("AUM"), an Emirati entity, function as its guarantor under the contract. AUM also took care of providing bunkers for Shimsupa.[1] Specifically, Fahim Shamsi of AUM reached out to Dean Tennant at BunkerEx (a bunker broker) to buy bunkers. Tennant then reached out to Three Fifty Markets,

---

[1] The parties dispute whether AUM had authority to act on behalf of Shimsupa. Because we need only address the ancillary issue of whether Shimsupa could bind the boat, I assume without deciding that AUM had authority to act on behalf of Shimsupa. For that reason, I speak as if Shimsupa itself entered the contract with Three Fifty.

Ltd. ("Three Fifty"), a commodity trader based in the United Kingdom. Tennant requested 800 metric tons of fuel. Three Fifty offered that quantity for $787 per metric ton. Shamsi accepted the deal.

The deal between Shimsupa and Three Fifty was memorialized in two documents: an (1) Order Confirmation sheet, and (2) Three Fifty's General Terms and Conditions of Sale. That second document, which Three Fifty tried to incorporate by reference in the order sheet, contains two relevant provisions. The first would allow Three Fifty to exercise a lien on the ARGOS if Three Fifty were not paid for the bunkers. The second was a choice-of-law clause selecting United States law for any questions related to "the existence of a maritime lien."

In October 2022, the ARGOS received the bunkers in Las Palmas, Spain. The bunkers were physically supplied by Oryx Energies, a company based in Geneva.

For sake of reference, here is a chart detailing these transactions[2]:



---

[2] I have simplified the details of the transactions by leaving out a troop of characters not relevant here. I have also left out a variety of legal relationships.

No. 24-30413

Three Fifty issued an invoice the following month that required payment in three days. Neither AUM nor Shimsupa paid—nor did anyone else.

## B

Three Fifty waited until the ARGOS showed up in the Port of New Orleans. Shortly after it did, on February 16, 2023, Three Fifty filed a complaint in the U.S. District Court for the Eastern District of Louisiana claiming a maritime lien on the ARGOS under 46 U.S.C. § 31342. The ARGOS was arrested. Argos Bulkers showed up as claimant of the vessel and posted bond.

Relying on the choice-of-law clause in Three Fifty's contract, the district court held that United States law applied and that under United States law Three Fifty was entitled to a maritime lien. The ARGOS, through its owner Argos Bulkers, timely appealed.

## II

The threshold issue in this case is whether Shimsupa could somehow expose Argos Bulkers' boat to a maritime lien by signing Three Fifty's bunker contract. True, under its charterparty with Argos Bulkers, Shimsupa had authority to buy bunkers for the ARGOS. (In fact, Shimsupa was *obligated* to buy bunkers.) But the charterparty also made it very clear that, in purchasing bunkers, Shimsupa was absolutely positively prohibited from doing anything that might expose the ARGOS to a maritime lien. Three Fifty's contract exposed the ARGOS to a maritime lien. So could Shimsupa expose the ARGOS to a maritime lien by signing that contract?

That question triggers several related legal questions:

- When Shimsupa entered the market for bunkers, could it even enter a contract that contemplated a maritime lien on the ARGOS? Or was such a contract void *ab initio*?

- Supposing Shimsupa could sign the bunker contract, were any of Three Fifty's maritime-lien provisions knocked out as a matter of contract law?

- Even supposing the bunker contract with all its provisions was valid as a matter of contract law, could the contract bind the ARGOS as it purported to do despite the no-liens provisions in the charterparty? Or was the bunker contract as effective in binding the ARGOS as a contract between you and your spouse purporting to bind your neighbor might be? (Read: not at all.)

- Does it matter that the bunker contract between Shimsupa and Three Fifty was mediated by a third-party guarantor (AUM) and a broker (BunkerEx)?

- When Three Fifty made its bunker offer to BunkerEx (which in turn conveyed it to AUM, which in turn conveyed it to Shimsupa), what obligation if any did Three Fifty have to understand the terms of Shimsupa's charterparty? Did Three Fifty's failure to understand the charterparty's no-lien provisions affect the enforceability of relevant provisions in its bunker contract?

We need not decide any of these questions today because all of them are beset by antecedent choice-of-law questions. Take the first one: When Shimsupa entered the market for bunkers, could it even sign a contract that contemplated a lien on the ARGOS? Before a court can answer that question, it must know *whose law applies to it*. Once the court knows which sovereign's law to apply, then and only then can it figure out the effect (if any) of the no-liens provisions in the charterparty. If Sovereign $X$'s law says, for example, that no-liens provisions in charterparties generally prohibit

charterers from signing lien provisions, that might mean that the entire bunker contract is void. Or it might mean that certain provisions in the bunker contract are void. Or it might mean the contract stands as a matter of contract law, but it is ineffectual in binding the boat as a matter of agency law, maritime law, property law, or some other body of law Sovereign *X* might consider relevant. We do not know. And we will not know until we know whose law even applies.

The district court, however, did not consider the choice-of-law problems posed by any of the bulleted questions. It instead skipped ahead to the bunker contract between Party *B* (Shimsupa) and Party *C* (Three Fifty)—ignoring the charterparty between Party *A* (Argos Bulkers) and Party *B* (Shimsupa). True, the *B-C* contract contains a choice-of-law clause that designates United States law. But the *B-C* contract obviously says nothing about the *A-B* contract. And the fact that the *B-C* contract designates United States law cannot possibly mean that United States law applies to the *A-B* contract. (After all, the *A-B* contract is both earlier in time and signed by different parties.) And if it were true that the *A-B* contract prevented Shimsupa from signing some or all of the *B-C* contract, or otherwise rendered the *B-C* contract unenforceable or irrelevant to this dispute, then the choice-of-law provision in the *B-C* contract would not control. By glossing over the *A-B* contract and the numerous choice-of-law questions posed by it, the district court "put[] the barge before the tug." *DeNicola v. Cunard Line, Ltd.*, 642 F.2d 5, 7 n.2 (1st Cir. 1981).

None of this is to cast doubt on the strong presumption that federal courts apply in favor of choice-of-law clauses in admiralty. *See Great Lakes Ins. SE v. Raiders Retreat Realty Co.*, 601 U.S. 65, 72 (2024). But it is to say that choice-of-law clauses apply to the parties that sign them—here, Party *B* and Party *C*. I am aware of no proposition in admiralty or any other area of law that makes a choice-of-law clause between *B* and *C* automatically

applicable to an *antecedent* contract, like the one between *A* and *B*. After all, *A* is a third party to *B* and *C*'s contract. See *Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024, 1026 (2d Cir. 1973) ("[R]ights of third persons cannot be affected by the intent of the parties to the contract." (citation omitted)). And choice-of-law clauses only tell courts what law "*the parties* intended to apply." *Raiders Realty*, 601 U.S. at 71 (emphasis added) (citation omitted). So courts enforce choice-of-law clauses out of "respect" for "freedom of contract." *Id.* at 71–72 (citation omitted). That means *B* and *C* are free to negotiate the law that applies to their own agreement as they see fit. But they can't override *A* and *B*'s choice of law in an earlier contract—even if that earlier choice ultimately affects the validity of *B* and *C*'s later-in-time agreement.

### III

*World Fuel Services Singapore Pte, Ltd. v. Bulk Juliana M/V*, 822 F.3d 766 (5th Cir. 2016), is not to the contrary.

In *World Fuel*, Denmar time-chartered the M/V BULK JULIANA from Bulk Juliana Ltd. *See id.* at 768. Denmar then contracted with World Fuel Services Singapore ("WFS") to supply bunkers to the BULK JULIANA. *Ibid.* Denmar's contract with WFS stipulated that United States law would apply to any future disputes. *Id.* at 769. The bunkers were delivered as promised, but no one paid. *Ibid.* So when the BULK JULIANA pulled into the Port of New Orleans, WFS asserted a maritime lien under United States law. *Ibid.*

The Fifth Circuit agreed. Along the way, the Fifth Circuit held that Denmar had bound the vessel to the choice-of-law clause because there was "a fundamental tenet of maritime law" supposedly common to all jurisdictions "that [c]harterers and their agents are presumed to have

authority to bind the vessel." *Id.* at 772–73 (quoting *Triton Marine Fuels, Ltd. v. M/V PACIFIC CHUKOTKA*, 575 F.3d 409, 414 (4th Cir. 2009)).

If anything, *World Fuel* supports my position. In that case, we said only "that [c]harterers and their agents are *presumed* to have authority to bind the vessel." *Id.* at 772–73 (emphasis added) (quotation omitted). But presumptions are just that: presumptions. And if anything would defeat the presumption that charterers can bind the vessel, it would presumably be explicit contractual terms stating a charterer cannot bind the vessel.

If charterers had universal freestanding rights to bind their chartered boats under all circumstances, we would have said that. But we did not. Rather, *World Fuel* said that its holding was grounded in respect for "freely negotiated contract terms." *Id.* at 773 (citation omitted). So in *World Fuel*, it was critical that the vessel owner had done nothing "to protect [itself] contractually in [its] dealings with time charterers from any perceived unfairness by the possible enforcement of maritime necessaries liens in U.S. ports." *Id.* at 773.

But here, unlike in *World Fuel*, the vessel owner did everything it could "to protect" itself "contractually." *Ibid.* Argos Bulkers made clear Shimsupa could do *nothing* "directly or indirectly" that might give rise to "any lien . . . or any rights of any kind whatsoever over the Vessel in respect of the supply of bunkers." Shimsupa even had to "inform" any "sellers of bunkers in writing . . . that the bunkers to be supplied" were "solely for" Shimsupa." So "neither the Vessel" nor the "Owners" were "a party to the bunker supply contract and no lien, encumbrance or any rights" could "arise on the Vessel." So if anything, *World Fuel*'s directive that courts respect "freely negotiated contract terms" counsels *against* permitting Shimsupa to bind the ARGOS. *World Fuel*, 822 F.3d at 773 (citation omitted).

No. 24-30413

Of course, I'm not suggesting we should resolve that question now. But we should vacate the district court's decision and remand so the court can conduct a proper choice-of-law inquiry to determine the effect of the *A-B* contract (between Argos Bulkers and Shimsupa) on the *B-C* contract (between Shimsupa and Three Fifty). Only after conducting that analysis can it then decide what to do with the *B-C* bunker contract and its separate choice-of-law clause.

IV

The majority considers at least some choice-of-law questions, *see ante*, at 6–11, but it also fails to address the legal questions presented by the *A-B* contract (between Argos Bulkers and Shimsupa) and the accompanying choice-of-law problems.

To the majority's credit, it recognizes that the district court skipped a step when it applied the choice-of-law clause in the *B-C* contract (between Shimsupa and Three Fifty) without first asking whose law controls the *B-C* contract's formation (and therefore, whether the choice-of-law clause itself was validly adopted). *Id.* at 6 (commenting that the district court "presuppose[d] that American law governed the contract's formation, or otherwise control[led]"). So the seven-plus-factor test in *Lauritzen v. Larsen*, 345 U.S. 571 (1953), is indeed relevant to figuring out which law governs the *B-C* contract's formation. *Id.* at 6–11.

But like the district court, the majority jumps straight to the *B-C* contract without answering the antecedent legal and choice-of-law questions posed by the *A-B* contract. That is a mistake because those questions must be answered *before* we can analyze the *B-C* contract questions.

Suppose that under the law governing the *A-B* contract, Shimsupa attempts to enter into a *B-C* contract with a maritime lien provision that renders the *B-C* contract void. In that scenario, the issues the majority

discusses—such as which law governs the *B-C* contract, *ante*, at 6–11, whether that law allows incorporating terms by reference, *id.* at 9–11, and whether granting the maritime lien was valid, *id.* at 11–28—are simply irrelevant. If the law governing the *A-B* agreement prevents *B* from signing the *B-C* contract (or otherwise renders the maritime lien provision within it unenforceable), Shimsupa and Three Fifty can't save the voided contract by pointing to the *B-C* contract's choice-of-law clause. Letting them do so violates basic contract and conflicts-of-law principles.

Of course, we don't know whether the law governing the *A-B* contract prevented Shimsupa from signing Three Fifty's contract. But we can't know unless we figure out which country's law applies to the charterparty. The majority should have required the district court to answer that question.

\*    \*    \*

We should have vacated the district court's decision and remanded the case to allow the court to address the choice-of-law issues presented by Argos Bulkers' and Shimsupa's charterparty. Because the majority does not address those issues, I respectfully dissent.